[This opinion has been published in *Ohio Official Reports* at 90 Ohio St.3d 388.]

DOE ET AL.; INTERSTATE FIRE AND CASUALTY COMPANY, APPELLEE, *v.*
SHAFFER ET AL.; DIOCESE OF COLUMBUS ET AL., APPELLANTS.

[Cite as *Doe v. Shaffer*, 2000-Ohio-186.]

*Insurance—Ohio public policy permits a party to obtain liability insurance coverage for negligence related to sexual molestation when that party has not committed the act of sexual molestation.*

Ohio public policy permits a party to obtain liability insurance coverage for negligence related to sexual molestation when that party has not committed the act of sexual molestation. (*Gearing v. Nationwide Ins. Co.* [1996], 76 Ohio St.3d 34, 665 N.E.2d 1115, paragraph two of the syllabus, construed; *Cuervo v. Cincinnati Ins. Co.* [1996], 76 Ohio St.3d 41, 665 N.E.2d 1121, and *Westfield Cos. v. Kette* [1996], 77 Ohio St.3d 154, 672 N.E.2d 166, modified.)

(No. 99-1986—Submitted September 13, 2000—Decided December 20, 2000.)

APPEAL from the Court of Appeals for Hamilton County, No. C-980729.

———————————

{¶ 1} John Doe[1] was a mentally retarded man who, until 1992, had resided for over twenty years in Pike County at the Good Shepherd Manor ("Manor"), a residential care facility for the mentally retarded. The Manor was formerly operated by a Roman Catholic religious order known as the Little Brothers of the Good Shepherd ("the Brothers"). In 1985, following allegations that there had been incidents of financial mismanagement and sexual abuse at the Manor, the Brothers were removed from the Manor by order of the Superior General of the Brothers, who was based in New Mexico.

———————————

1. This individual's name has been changed.

**{¶ 2}** In late 1992, after Doe was diagnosed as having contracted the human immunodeficiency virus ("HIV"), he moved from the Manor to his parents' residence in Hamilton County. Doe and his parents, acting individually and on his behalf, filed suit in 1993 against the Brothers, individual employees of that order, the Catholic Diocese of Columbus ("the Diocese"), Bishop James A. Griffin, and others,[2] alleging that Doe had been sexually molested and infected with HIV by Manor employees under the control of the Diocese and Griffin. The Does alleged several causes of action against the various parties, including negligent hiring, transmission of a communicable sexually transmitted disease, fraud, and sexual molestation.[3] During the pendency of this suit, Doe died of complications related to acquired immune deficiency syndrome.[4]

**{¶ 3}** Doe's parents settled with Griffin and the Diocese. Prior to settlement, however, appellee Interstate Fire & Casualty Company ("Interstate") intervened, seeking a declaratory judgment that it had no duty to defend or indemnify the Diocese or Griffin under three separate insurance policies in effect during the pertinent time frame. The policies provided liability indemnity coverage in excess of the limits of coverage afforded by a number of underlying insurance policies.

**{¶ 4}** The Diocese and Griffin filed an answer that included a counterclaim for declaratory judgment that Interstate possessed a duty to defend and indemnify

---

2. The Roman Catholic Church of the Archdiocese of Santa Fe and related parties were dismissed with prejudice following a stipulation by the Does that these parties had resolved the dispute.

3. The second amended complaint filed by the Does alleged the following causes of action and claims against the Diocese and Griffin: fraud; negligent and/or reckless supervision and/or retention; violation of statutory duty of care; negligent or reckless and wanton failure to warn; *respondeat superior* and agency; misrepresentation with negligent, reckless, and wanton retention and supervision; loss of society; fraud in inducement of contract; breach of implied contract and warranty; breach of contract with damages to third-party beneficiary; breach of fiduciary duty; punitive damages; and wrongful death.

4. Doe's father also died while the suit was pending

them. Interstate then moved for summary judgment. The trial court denied the motion, but then granted judgment for Interstate upon reconsideration. The court entered summary judgment for Interstate on the grounds that public policy barred coverage both for intentional acts of sexual molestation and for negligence claims that flowed from the molestation. The court of appeals affirmed, holding that, because intentional acts of sexual molestation and negligence claims that are derived from such acts are uninsurable pursuant to Ohio public policy, Interstate was entitled to summary judgment as a matter of law.

{¶ 5} The cause is before this court upon allowance of a discretionary appeal.

_____

*Reminger & Reminger, Clifford C. Masch* and *David Ross,* for appellee.

*Kegler, Brown, Hill & Ritter, Thomas W. Hill, Robert G. Schuler* and *Paul D. Ritter, Jr.*, for appellants.

_____

**COOK, J.**

{¶ 6} This case presents the issue of whether the public policy precluding liability insurance coverage for acts of sexual molestation also prohibits coverage for a nonmolester for related claims alleging negligent supervision, negligent retention, and negligent failure to warn. Because we conclude that such coverage does not violate public policy, we reverse the judgment of the court of appeals and remand this cause for further proceedings.

I. Standard of Review

{¶ 7} We review the grant of summary judgment *de novo. Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241, 245. Therefore, Interstate may prevail under Civ.R. 56(C) only if "(1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one

conclusion when viewing evidence in favor of the nonmoving party, and that conclusion is adverse to the nonmoving party." *Id*., citing *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.* (1994), 69 Ohio St.3d 217, 219, 631 N.E.2d 150, 152.

## II.  Application of Ohio Public Policy

{¶ 8} We now consider whether, as a matter of law, Ohio public policy precludes insurance coverage for the negligence alleged here.  We conclude that it does not.

{¶ 9} As early as 1938, this court found that it was "well settled from the standpoint of public policy that the act of intentionally inflicting an injury cannot be covered by insurance in anywise protecting the person who inflicts such injury." *Rothman v. Metro. Cas. Ins. Co.* (1938), 134 Ohio St. 241, 246, 12 O.O. 50, 52, 16 N.E.2d 417, 420.  See, also, *Commonwealth Cas. Co. v. Headers* (1928), 118 Ohio St. 429, 161 N.E. 278.  Accordingly, we have long adhered to the view that Ohio prohibits insuring against liability for one's own intentional torts.  See *Buckeye Union Ins. Co. v. New England Ins. Co.* (1999), 87 Ohio St.3d 280, 283, 720 N.E.2d 495, 498; *Gearing v. Nationwide Ins. Co.* (1996), 76 Ohio St.3d 34, 38, 665 N.E.2d 1115, 1118; *Wedge Products, Inc. v. Hartford Equity Sales Co.* (1987), 31 Ohio St.3d 65, 67, 31 OBR 180, 181, 509 N.E.2d 74, 76 (no coverage for tort where employer was substantially certain that employees would be injured); *Preferred Mut. Ins. Co. v. Thompson* (1986), 23 Ohio St.3d 78, 81, 23 OBR 208, 210, 491 N.E.2d 688, 691.

{¶ 10} Application of this public policy has not always been absolute.  In *Harasyn v. Normandy Metals, Inc.* (1990), 49 Ohio St.3d 173, 551 N.E.2d 962, for example, we addressed whether the general public policy precluding insuring against liability for intentional torts prevented an employer from procuring insurance for a tortious act performed not with purpose to injure but with the

4

knowledge that injury was substantially certain to occur. We concluded that it did not.[5] We reasoned:

"It is often said that public policy prohibits liability insurance for intentional torts. This statement is based on 'the assumption that such conduct would be encouraged if insurance were available to shift the financial cost of the loss from the wrongdoer to his insurer. * * *' Farbstein & Stillman, Insurance for the Commission of Intentional Torts (1969), 20 Hastings L.J. 1219, 1245-1246. However, this blanket prohibition 'makes no distinctions as to the various forms of intentional wrongdoing and does not admit the possibility that some torts might not be particularly encouraged if insurance were available for them.' *Id*. at 1251. The better view is to prohibit insurance only for those intentional torts where 'the fact of insurance coverage can be related in some substantial way to the commission of wrongful acts of that character. * * *' *Isenhart v. General Cas. Co.* (1962), 233 Ore. 49, 52-53, 377 P.2d 26, 28." (Citations omitted.) *Id*. at 176, 551 N.E.2d at 965.

{¶ 11} In *Gearing*, we then analyzed the general public policy in the context of sexual molestation claims. There, this court was asked to decide whether courts should infer intent to injure as a matter of law from the sexual abuse of a child. We held, as have the overwhelming majority of other jurisdictions, that courts should infer such intent. *Gearing*, 76 Ohio St.3d at 37-38, 665 N.E.2d at 1118. As a result, we concluded that public policy precluded the issuance of coverage for this intentional tort. *Id*. at 40, 665 N.E.2d at 1119.

---

5. We recognize that there is debate within this court concerning the current state of the law on whether "substantial-certainty" torts fall within the public policy exclusion for insurance coverage. See *Buckeye Union Ins. Co. v. New England Ins. Co.* (1999), 87 Ohio St.3d 280, 288, 720 N.E.2d 495, 502 (Cook, J., dissenting). In this case, however, this question is not implicated. Rather, this court's explication of the public policy in *Harasyn* is used only to inform today's decision as to whether the purpose of the public policy extends to negligent conduct.

**{¶ 12}** We issued our decision in *Gearing* on the same day that we issued *Cuervo v. Cincinnati Ins. Co.* (1996), 76 Ohio St.3d 41, 665 N.E.2d 1121. In *Cuervo*, this court addressed whether a father could be indemnified under his homeowner's policy for claims of negligence brought because his son, who was also an insured on the policy, molested a child. After first deciding that *Gearing* forbids indemnification of the son, this court went on to hold that public policy also forecloses indemnification of the father, saying:

"Similarly, the damages for which the Cuervos seek compensation flow from [the son's] intentional acts of sexual molestation of a minor. Thus, and on this record, the obligation of Cincinnati to pay the judgment entered against his father * * * is precluded as well." *Id*. at 44, 665 N.E.2d at 1122-1123.

**{¶ 13}** The Diocese and Griffin interpret the *Cuervo* holding to say that the negligent insured is foreclosed from indemnification only when the intentional tortfeasor is an insured under the policy through which the negligent insured claims coverage. They assert that, unless the intentional tortfeasor is on the *same policy* as the negligent insured, insurance extends to negligence related to sexual molestation.

**{¶ 14}** This court's opinion in *Cuervo* did not, however, analyze the language of the Cuervos' insurance policy. So, says Interstate, *Cuervo* cannot stand for the rule that coverage is denied only when the sexual molester is an insured on the same policy. Rather, Interstate argues, *Cuervo* stands for the proposition that "insurance to *anyone* for injuries flowing from sexual molestation is against public policy."[6] (Emphasis added.)

---

6. Support for this interpretation lies in this court's only application of *Cuervo*. In *Westfield Cos. v. Kette* (Mar. 29, 1996), Erie App. No. E-95-051, unreported, 1996 WL 139636, the Sixth District found that coverage for the wife of an alleged molester existed under a homeowner's policy that provided coverage for an insured's negligence, "irrespective of whether a co-insured's intentional acts give rise to an exclusion for him." *Id*. at 9, 1996 WL 139636, at *4. We summarily reversed,

**{¶ 15}** In order to resolve this debate between the parties, we reevaluate the *Cuervo* judgment that imputes the sexual molester's intent to one whose conduct is only negligent with regard to the sexual molestation. In so doing, we continue to adhere to *Cuervo's* holding that public policy precludes liability insurance coverage for intentional acts of sexual abuse. For the following reasons, however, we decline to adhere to that portion of *Cuervo* that precludes insurance coverage for a nonmolester's negligence related to sexual molestation.

**{¶ 16}** In *Gearing*, we stated that "[l]iability insurance does not exist to relieve wrongdoers of liability for intentional, antisocial, criminal conduct." *Gearing*, 76 Ohio St.3d at 38, 665 N.E.2d at 1118. We also opined that "[s]exual abuse of children constitutes conduct so reprehensible that the General Assembly has categorized such conduct as felonious upon commission of the proscribed acts themselves[.]" *Id*. at 38-39, 665 N.E.2d at 1119, citing R.C. 2907.05. The express societal condemnation that animates the public policy forbidding insurance for the intentional tort of sexual molestation, however, does not exist for the tort of negligence. Many of the claims against the Diocese and Griffin sound in negligence, and to deny them coverage as an extension of this public policy would be untenable.

**{¶ 17}** This is so because the intentions of the molester are immaterial to determining whether the allegedly negligent party has coverage. *Silverball Amusement, Inc. v. Utah Home Fire Ins. Co.* (W.D.Ark.1994), 842 F.Supp. 1151, 1160, affirmed (C.A.8, 1994), 33 F.3d 1476 (permitting coverage for alleged negligent hiring and supervision by an insured despite molestation by another insured), citing *Sena v. Travelers Ins. Co.* (D.N.M.1992), 801 F.Supp. 471, 475. In reaching this conclusion, we find the rationale employed in *Silverball* informative. While acknowledging that jurisdictions have arrived at different conclusions as to

---

based on the authority of *Cuervo*. *Westfield Cos. v. Kette* (1996), 77 Ohio St.3d 154, 672 N.E.2d 166. To the extent that *Cuervo* is modified this day, so too is *Westfield* modified.

whether alleged negligence related to sexual molestation can constitute a policy occurrence, the *Silverball* court reasoned that the intentions or expectations of the negligent insured must control the coverage determination, and not the intentions or expectations of the molester. *Id*. at 1160. The court explained that a contrary practice would be unreasonable, saying:

"The ultimate effect of [those opinions denying coverage] leads to a metamorphosis in which certain negligent actions are transformed by the court into intentional actions for the purposes of deciding negligent hiring cases involving sexual abuse. Such a decision effectively dissolves the distinction between intentional and negligent conduct, allowing the intentional act to devour the negligent act for the purpose of determining coverage. The correct method of analyzing this issue in cases with the factual setting and insurance policy provisions involved * * * would deal with each act on its own merits and recognize that employers who make negligent hiring decisions clearly do not intend the employees to inflict harm." *Id*. at 1163.

{¶ 18} A contrary interpretation that refuses to distinguish between the abuser's intentional conduct and the insured's alleged negligence would impermissibly ignore the plain language of an insurance policy that excludes from coverage bodily injury that was expected or intended from the standpoint of the insured. See *United States Fid. & Guar. Co. v. Open Sesame Child Care Ctr.* (N.D.Ill.1993), 819 F.Supp. 756, 760.[7] Here, Interstate does not dispute that neither

---

7. See, also, *Evangelical Lutheran Church in Am. v. Atlantic Mut. Ins. Co.* (C.A.5, 1999), 169 F.3d 947 (finding that a duty to defend insured existed under policy excluding bodily injuries expected or intended by the insured, because the negligence alleged was not an intentional tort, and the molester's acts should not be considered the insured's acts); *St. Paul Fire & Marine Ins. Co. v. Schrum* (C.A.8, 1998), 149 F.3d 878, 881 (holding that molestation by third party is "merely incidental" to claim of negligent supervision despite exclusion for bodily injury "arising out of any sexual act, including but not limited to molestation"); *Am. States Ins. Co. v. Borbor* (C.A.9, 1987), 826 F.2d 888, 895 (permitting coverage because, under California law, allegedly negligent, separately insured wife of molester was an "innocent" insured and "[l]iability insurance policies are typically sold and purchased to provide indemnification for liability which may be imposed as a result of negligence").

the Brothers nor the individual members of the Brothers against whom claims were brought qualify as insureds under the terms of the involved policies. Accordingly, concluding that the Diocese or Griffin, the actual insureds, expected or intended the injuries that Doe sustained would not only be a tortured interpretation of the facts of this case, but an inherently illogical interpretation as well. See *Silverball*, 842 F.Supp. at 1158 ("It would require a tortured interpretation of this case to decide that when Silverball hired [the molester] it intended or expected that he would molest children").

**{¶ 19}** Further, unlike in instances of sexual molestation, permitting coverage for the type of conduct alleged here does not " 'subsidiz[e] the episodes of child sexual abuse of which its victims complain, at the ultimate expense of other insureds to whom the added costs of indemnifying child molesters will be passed.' " *Gearing*, 76 Ohio St.3d at 39, 665 N.E.2d at 1119, quoting *Horace Mann. Ins. Co. v. Fore* (M.D.Ala.1992), 785 F.Supp. 947, 956. Rather, the critical issue is the nature of the intent—inferred or otherwise—of the party seeking coverage. Cf. *Preferred Mut. Ins. Co.*, 23 Ohio St.3d at 81, 23 OBR at 210, 491 N.E.2d at 691, and *Transamerica Ins. Group v. Meere* (1984), 143 Ariz. 351, 356, 694 P.2d 181, 186 (both finding the public policy precluding liability insurance for intentional torts inapplicable to self-defense because the concern over indemnifying wrongful action is negated by the purpose of the actor). Society does not want to encourage or indemnify the wrongful conduct of the molester, but precluding coverage for a negligent party would not further this goal. See *Silverball*, 842 F.Supp. at 1164 ("This public policy [against coverage] does not apply when the wrongdoer is not helped and an insured who did not commit the wrong receives the protection of the insurance contract"). Instead, precluding coverage would risk preventing the victim from obtaining a fair and adequate recovery, in contravention of the purpose of modern tort law. See *Harasyn*, 49 Ohio St.3d at 176, 551 N.E.2d at 965

(explaining that "public policy [has come] to favor liability insurance for negligent acts as a means of assuring that innocent persons are made whole").

{¶ 20} Finally, here, unlike in *Gearing*, we do not believe that " 'the average person purchasing homeowner's insurance would cringe at the very suggestion that he was paying for such coverage * * * [a]nd certainly * * * would not want to share that type of risk with other homeowner's policyholders.' " *Gearing*, 76 Ohio St.3d at 39, 665 N.E.2d at 1119, quoting *Rodriguez v. Williams* (1986), 42 Wash.App. 633, 636, 713 P.2d 135, 137-138. While it is indeed true that the average person would likely find liability coverage for the intentional tort of sexual molestation loathsome, the same rationale cannot extend to negligence. The average person would no doubt find such coverage to be the purpose for which he obtained insurance.

{¶ 21} Accordingly, we modify *Cuervo* and *Westfield* to hold that Ohio public policy permits a party to obtain liability insurance coverage for negligence related to sexual molestation when that party has not committed the act of sexual molestation. In light of this holding, we find that the court of appeals erred in holding that the acts of negligence alleged here could not constitute occurrences under an insurance policy as a matter of law.

### III. Conclusion

{¶ 22} Because we now hold that coverage under the Interstate policies would not violate public policy, we reverse the court of appeals' judgment in favor of Interstate that was based on our prior holdings in *Gearing* and *Cuervo*. The cause is remanded for further proceedings consistent with this opinion.[8]

*Judgment reversed*

*and cause remanded.*

---

8. Because other issues argued by the parties in the proceedings below are either not before this court or are not material to the issue of whether public policy precludes coverage of the sort sought here, we express no opinion as to these issues and their effect on whether indemnification is warranted under the facts of this case.

MOYER, C.J., F.E. SWEENEY and PFEIFER, JJ., concur.

DOUGLAS and RESNICK, JJ., concur in judgment only.

LUNDBERG STRATTON, J., concurs in part and dissents in part.

———————————

**LUNDBERG STRATTON, J., concurring in part and dissenting in part**.

{¶ 23} While I agree with the majority's conclusion that it is not against public policy to allow a person to insure against liability for negligence related to sexual molestation, I believe this holding should be applied prospectively only.

{¶ 24} The law in Ohio has been that negligent acts that are associated with intentional acts of sexual molestation or other intentional harms do not constitute "occurrences" under a policy of liability insurance. *Cuervo v. Cincinnati Ins. Co.* (1996), 76 Ohio St.3d 41, 44, 665 N.E.2d 1121, 1122-1123. Insurance has not been available to indemnify damages that flow from intentional torts. *Gearing v. Nationwide Ins. Co.* (1996), 76 Ohio St.3d 34, 38, 665 N.E.2d 1115, 1118. This has included the denial of coverage for damages from the intentional acts as well as from the negligent acts that are associated with the intentional acts because "incidents of intentional acts of sexual molestation of a minor do not constitute 'occurrences' for purposes of determining insurance coverage." *Cuervo*, 76 Ohio St.3d at 43, 665 N.E.2d at 1122-1123. We previously held that an act committed with an intent to harm is inconsistent with an insurance policy's definition of "occurrence" that is based upon the concept of an accident. Thus, an intentional harm is not even an "occurrence." Likewise, in *Cuervo*, we extended this reasoning to include negligent acts where the damages flow from an intentional tort. The alleged negligence of the parents of a minor who committed acts of sexual abuse in *Cuervo* was not an "occurrence" within the meaning of a liability insurance policy.

{¶ 25} Now this court has reevaluated its interpretation of public policy. The new interpretation rests on the conclusion that the "occurrence" for purposes of liability insurance coverage can be the alleged negligence of the insured that is

related to the underlying act of sexual molestation, not the intentional act itself. Because this reverses our previous position on this legal issue, I believe we should apply this interpretation prospectively only.

{¶ 26} Therefore, while I believe that the negligence related to intentional acts of sexual molestation could be insurable, such a change should apply only to future incidents.

————————————